J-A18041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: J.D., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 297 WDA 2021 |

Appeal from the Order Entered February 3, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000130-2020

| IN THE INTEREST OF: M.D., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 298 WDA 2021 |

Appeal from the Order Entered February 3, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000129-2020

BEFORE:  OLSON, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED:  NOVEMBER 16, 2021**

J.C. ("Mother") appeals from the Orders entered on February 3, 2021, granting the Petitions filed by the Allegheny County Office of Children, Youth, and Families ("CYF"), seeking to terminate Mother's parental rights to her minor children, J.D. (a male born in March 2017) and M.D. (a female born in

May 2018) (collectively "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] We affirm.

The trial court aptly summarized the factual and procedural history of this case, which we adopt for purposes of this appeal. *See* Trial Court Opinion, 4/5/21, at 4-6. We provide the following brief factual recitation. CYF became involved with Mother after the birth of J.D., following a report that J.D. had tested positive for methadone, and Mother had a history of heroin addiction. CYF had several additional interactions with Mother and, eventually, J.D. was removed from Mother's care in June 2017. J.D. was adjudicated dependent in July 2017. M.D. was born in May 2018. J.D. was returned to Mother's care in June 2018, and the dependency case was closed in October 2018.

CYF became involved again following a referral regarding Father's cocaine use in December 2018. CYF received another referral in March 2019, following a medical appointment in which Mother requested pain medication and was presenting as overly emotional, and M.D., who was present at the appointment and ten-months old at the time, had a flat affect. CYF did not open a case following those incidents.

---

[1] The trial court also terminated the parental rights of the Children's father, J.D., ("Father") and the unknown father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Although Father had signed an Acknowledgement of Paternity for the Children, CYF did not have a copy the Acknowledgement at the time CYF filed its Petitions, therefore, an unknown father was included. *See* Petition, 9/15/20, at 2, n. 1; Petition, 9/15/20, at 2, n. 1. During the termination hearing, Father withdrew from the proceedings, and agreed that the Children should remain in their current foster home. N.T., 2/1/21, at 8.

CYF removed the Children in September 2019, after Mother had overdosed in front of the Children and had to be revived with Narcan. At the dependency hearing, Mother stipulated that she had overdosed on heroin and had been charged with endangering the welfare of children. The Children were adjudicated dependent in September 2019. Mother's goals were to participate in drug and alcohol treatment and urine screens, maintain stable housing, address mental health concerns, visit with the Children, and cooperate with CYF.

CYF filed Petitions to involuntarily terminate Mother's parental rights to the Children on September 15, 2020. Following a hearing on February 1, 2021, the trial court entered Orders terminating Mother's parental rights to the Children. Order, 2/3/21; Order, 2/3/21. Mother timely filed Notices of Appeal, along with Pa.R.A.P. 1925(a)(2)(i) and (b) Concise Statements of errors complained of on appeal.[2]

On appeal, Mother raises the following questions for our review:

I. Did the trial court abuse its discretion and/or err as a matter of law in granting the [P]etition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), (2), (5), and (8)?

II. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [Children,] pursuant to 23 Pa.C.S.[A] § 2511(b)?

---

[2] This Court, *sua sponte*, consolidated Mother's appeals. Order, 3/23/21.

Mother's Brief at 8.

In reviewing a trial court order granting a petition to involuntarily terminate parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, [], 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d 567, 572 (Pa. 2011) [(plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, … 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***
>
> As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, as we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will address sections 2511(a)(1) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 5 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In her first claim, Mother argues that the trial court abused its discretion when it concluded that termination was proper under, *inter alia*, 23 Pa.C.S.A. § 2511(a)(1). Mother's Brief at 21. Mother avers that the trial court erred because she has continued to work on her goals to achieve reunification. ***Id.*** at 23. Mother further asserts that the trial court improperly found that she had not remedied the conditions which led to the removal of the Children. ***Id.*** at 24. Mother contends that CYF has failed to prove that Mother was still using drugs, and that the court-appointed psychologist did not assess Mother's capacity to parent the Children. ***Id.*** at 25.

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated,

- 6 -

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

In **Adoption of S.P.**, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that she has abandoned her child.

[W]e noted that a parent "has an affirmative duty to love, protect and support h[er] child and to make an effort to maintain communication and association with that child." [**In re: Adoption of McCray**, 331 A.2d 652, 655 (Pa. 1975)].

* * *

Where the parent does not exercise reasonable firmness in declining to yield to obstacles, h[er] other rights may be forfeited.

**Adoption of S.P.**, 47 A.3d at 828.

Here, the trial court thoroughly considered the facts and determined that Mother failed to perform her parental duties for the requisite six-month period. **See** Trial Court Opinion, 4/5/21, at 6-13. The trial court's findings are supported by competent, clear, and convincing evidence in the record, and its legal conclusions are sound. We therefore affirm on the basis of the trial court's Opinion with regard to termination pursuant to 23 Pa.C.S.A. § 2511(a)(1). **See** Trial Court Opinion, 4/5/21, at 6-13.

In her second issue, Mother argues that the trial court abused its discretion when it concluded that termination of her parental rights was in the best interest of the Children, pursuant to 23 Pa.C.S.A § 2511(b). Mother's Brief at 27. Mother argues the trial court erred because the court-appointed psychologist could not state that termination of Mother's parental rights was in the Children's best interest. *Id.* Mother further avers that an interactional evaluation was necessary for the psychologist to provide an expert assessment of the impact termination would have on the psychological welfare of the Children. *Id.* Finally, Mother argues that the Children "need and deserve" to have their relationship with Mother preserved, which can only occur if Mother retains her parental rights. *Id.*

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010). "Additionally, section 2511(b) does not require a formal bonding evaluation." *Id.* Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent.… Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where

- 9 -

placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

In the instant case, the trial court reviewed the evidence and found that severing any bond that the Children have with Mother would not cause any extreme emotional consequences. Trial Court Opinion, 4/5/21, at 16. The court referred to the testimony and evidence about Mother's "significant lack of presence and the result of that absence did nothing to support or nurture any attachment that might have once existed with the Children." *Id.* The trial court further noted that testimonial evidence established that terminating Mother's parental rights will provide the Children with stability and permanence at this point in their young lives. *Id.* Moreover, to the extent

Mother argues that an expert opinion or formal analysis is necessary, that requirement is not borne out by our case law.   ***See In re Z.P.,*** 994 A.2d at 1121.   We discern no error or abuse its discretion by the trial court in terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(b).   We therefore affirm on the basis of the trial court's Opinion with regard to termination pursuant to subsection (b).   ***See*** Trial Court Opinion, 4/5/21, at 13-17.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/2021

- 11 -

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN THE INTEREST OF: J.D. and M.D., minor children, | : : : | **CHILDREN'S FAST TRACK APPEAL** |
| APPEAL OF: J.C., natural Mother. | : : : : : | Docket No.: DP-790-2017, 479-2018 TPR No.: AP-129-2020, 130-2020 298 WDA 2021 |

## OPINION

McCRADY, J.                                                                April 5, 2021

On February 1, 2021, following a one-day hearing on the above captioned matter in which Mother participated and was represented by counsel, this Court issued an order granting the petitions of the Allegheny County Office of Children, Youth and Families ("CYF") to involuntary terminate the parental rights of J.S. ("Mother"), the natural parent of J.D. (DOB 3/16/17) and M.D. (DOB 5/27/18), pursuant to 23 Pa. C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and §2511(b).[1] For the reasons set forth below, the Order of this Court terminating the Mother's rights to the child should be affirmed.

---

[1] This Court terminated the rights of the Father and the Unknown Father pursuant to 23 Pa. C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and §2511 (b). Father withdrew his contest at the time of the proceeding, stipulating that he would be incarcerated through at least April 2021 and then will have to report to a three-quarters house, acknowledging that is unavailable to care for his children. T. T. at 8.

1

## A.                                                                            Standard

CYF based its petition to terminate Mother's parental rights on 23 Pa. C.S.A. §§ 2511 (a)

(1), (a)(2), (a)(5), and (a)(8). These subsections provide for the involuntary termination of

parental rights if the petitioner can establish any of the following grounds:

> (a)(1) The parent by conduct continuing for at least six months immediately preceding the filing of the petition has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. [...]

> (a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. [...]

> (a)(5) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. [...]

> (a)(8) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa. C.S.A. §§ 2511 (a)(1), (a)(2), (a)(5), and (a)(8).

Once the statutory grounds for involuntary termination of parental rights have been

shown by clear and convincing evidence, the Court must consider whether the termination would

meet the needs and welfare of the child under subsection § 2511(b):

2

(b) Other considerations. – The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa. C.S.A. § 2511(b)

A party seeking termination of parental rights must establish by clear and convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for termination; if it is determined that this burden of proof has been met, then the trial Court must next consider the second step of the process, which entails a determination of whether termination best serves the needs and welfare of the child. *In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007). In reviewing an order terminating parental rights, the appellate court "is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re S.H.*, 879 A.2d 802, 809 (Pa. Super. 2005). Furthermore, the trial court is "the sole determiner of the credibility of witnesses and resolves all conflicts in testimony." *Id.*

With the above standards in mind, and based on the admitted evidence and testimony presented, the Court found that grounds for termination had been firmly established and termination meets the developmental, physical and emotional needs and welfare of these children.

### B. Relevant Factual History

3

J.D. was born on March 16, 2017 and M.D. was born on May 27, 2018 to Mother.[2] *See* T.T.[3] at 14. CYF became involved with Mother the day after the birth of J.D. due to a report that the child tested positive for methadone at birth and Mother had a history of a heroin addiction. Id. at 16. At the request of the child welfare agency from a neighboring county, Allegheny County CYF conducted a courtesy home assessment but did not open a case. *Id.* The next contact CYF had with Mother was on June 10, 2017 due to allegations received that Father pulled "what appeared to be a tire gauge from his pocket and used it to smoke crack and offered it to Mother who also used it for the same with [J.D.] in her lap." *Id.* at 16. CYF opened a case at that time on the child J.D. and he was subsequently removed from his Mother's care on June 26, 2017. *Id.* at 17. At the shelter hearing, the Court ordered the Child to remain in care and he was adjudicated dependent on July 20, 2017. *Id.* at 17. J.D. remained in foster care placement from June 26, 2017 through June 29, 2018, at which time he was successfully returned to his Mother's care, and the dependency case closed in October 2018. *Id.* at 17-18. During the time of J.D.'s first removal and adjudication, CYF's concerns with Mother included her drug and alcohol use, her housing stability, and her mental health. *Id.* at 18. During the pendency of that case, CYF of-

---

[2] For the purposes of this Opinion, J.D. and M.D. will be referred to as "Child" or "Children". When referring to a singular "Child", the use of pronouns will indicate whether reference is being made to J.D. (a male) or M.D. (a female). Furthermore, the term "Children" or "Mother's Children" only refers to J.D. and M.D. Mother has two older children, parental rights intact, who reside in the primary care and control of Mother's mother via a Family Court order out of another county, and are not subject to this Court's jurisdiction.

[3] "T.T." denotes the Testimony of Transcript dated February 1, 2021 followed by the page number.

4

fered and provided Mother with a number of services aimed at addressing these issues, such as Genesis[4], POWER[5], and the Goodwill Rapid Rehousing Program. *Id.* at 18-19.[6]

The next referral CYF received for Mother was on December 12, 2018 when it was alleged that Father, who was residing with Mother and the Children, had tested positive for cocaine and was being sent to a halfway house. *Id.* at 19. CYF did not open a case at that time. On March 28, 2019, CYF received another referral that alleged Mother was at a medical appointment requesting to be prescribed pain medication and was presenting as overly emotional. It was also reported to CYF that M.D., who was ten months old, was also at that appointment and had a flat affect. *Id.* at 20. CYF did not open a case at that time.

On September 19, 2019, after an alleged overdose in front of the children where she was revived with Narcan, Mother was arrested and was charged with Endangering the Welfare of a Child , at which time CYF opened a case on both Children. *Id.* at 20; *see also* CYF Exhibit 5 - Mother's Certified Criminal Orders. At the time of the removal, both Children — then aged two years and six months and one year and three months respectively — were only in diapers, J.D. was non-verbal and had ring worm, and M.D. had bug bites on her legs. *Id.* at 24. The children were placed in a non-relative foster home through Presley Ridge, and were adjudicated dependent on September 18, 2019. *Id.*

At the adjudication hearing, Mother stipulated that she had overdosed on heroin, was facing criminal charges of Endangering the Welfare of Children, and that she was planning to re-

---

[4] Genesis is a program that helps Mothers and expecting Mothers with homelessness and housing stability, among other things.

[5] POWER stands for PA Organization for Women in Early Recovery and provides evaluations, screening, assistance and mentorship for individuals struggling with substance use.

[6] A petition for dependency was also filed on the Child, M.D., after her birth but was later withdrawn. *Id.* at 46.

sume both substance abuse and mental health treatment. *Id.* at 25. The Court changed the placement of the children to the foster home where J.D. had been previously placed and resided during his first adjudication and placement. Mother had, in fact, contacted this prior placement to see if they would take the Children in. *Id.* at 169 The Children have remained together in that non-relative foster home since September 20, 2019. *Id.* at 26.

Mother's goals for this second adjudication of J.D. and first adjudication for M.D. remained largely the same — to participate in drug and alcohol treatment and random urine screens, to participate in mental health treatment, to maintain stable housing, to visit with her children, and to communicate and cooperate with the agency. *Id.* at 26-27.

CYF regularly held Family Service Plan teaming meetings throughout the pendency of the case and Mother's participation was inconsistent. *Id.* at 27; see also CYF Exhibit 4 - Family Plans. Due to Mother's lack of consistent and regular contact with CYF and the children for a period of six months, CYF filed an aggravated circumstances petition with respect to Mother for both children and this Court entered an order finding aggravated circumstances did exist but that reasonable efforts were to continue on July 15, 2020. CYF filed the petitions to involuntarily terminate Mother's rights to J.D. and M.D. on September 15, 2020.

### C. Discussion

In her wholesale appeal, Mother argues that this Court abused its discretion and/or erred when it terminated her rights as to 23 Pa. C.S.A. §§ 2511 (a)(1), (a)(2), (a)(5), (a)(8) and §2511(b). *See* Mother's Notice of Appeal and Statement of Errors, at paragraph 1 and 2.

At the time of the contested termination proceeding, on February 1, 2020, the Children were three years and eleven months old and two years and eight months old, respectively, and

6

been in care over fifteen consecutive months. J.D. was adjudicated dependent for the second time by this Court, for the same concerns: Mother's drug and alcohol use, the interplay with her mental health concerns, her unstable housing conditions, and her ability to appropriately parent her young Children given these issues. The evidence and testimony provided at the contested termination proceeding unequivocally establish that Mother had evidenced a pattern of conduct continuing for at least six months prior to the filing of the petitions where Mother evidenced a settled purpose of relinquishing her Children and where she failed to perform parental duties, and that Mother was clearly unwilling or unable to even make reasonable progress in order to remedy the conditions that led to the removal and as such, she rendered herself unable to assume a role where she is able to provide essential parental care for her young children.

Mother had a goal to address her drug and alcohol problems. The CYF caseworker supervisor, Lawrence Walters, testified that Mother had self-reported to the agency a history of heroin and crack use. *Id.* at 33. Mr. Walters testified that since the adjudication in September 2019, Mother reported involvement with the Tadiso[7] program and involvement with the NATP program[8]. Mr. Walters testified that by March 2020 CYF had confirmed that Mother was no longer a patient at Tadiso. *Id.* at 33. The agency was unable to confirm Mother's participation in the NATP program. *Id.* at 34. In accordance with the Court's directives, CYF scheduled random urine screens for Mother. From September 2019 to February 21, 2020, Mr. Walters testified that

---

[7] Tadiso is a MAT, or medically assisted treatment, program also known as a methadone maintenance or methadone dosing program.

[8] The NATP program, which stands for Narcotic Addiction Treatment Program, is a program through Western Psychiatric Institute and Clinic, which is a dual diagnosis program that provides medically assisted treatment and outpatient mental health treatment.

7

CYF scheduled six random urine screens. *Id.* at 35. Mr. Walters stated that Mother attended two of the six scheduled urine screens. *Id.*

Daniel Zoldos, an employee of the Allegheny County Health Department who works as a lab technician, was called to testify regarding Mother's random screens. Mr. Zoldos testified that Mother was called to provide a urine screen six (6) times starting in September 2019 and that Mother participated in two (2) screens. *Id.* at 94. Mr. Zoldos testified that the two (2) screens Mother provided were both positive for substances. *Id.* at 94-95. Mr. Zoldos further explained that Mother acknowledged a prescription for methadone and she acknowledged a benzodiazepine positive, which Mother self-reported as Valium given to her at the Allegheny County Jail to ease withdrawal symptoms. *Id.* At Mother's request, both screens were sent to the lab for confirmation, as Mother also showed as being positive for opiates in both screens. *Id.* 94-96. Mr. Zoldos testified that prescription methadone does not yield a positive screen for opiates as "those are two different substances and two different metabolites being picked up on the screening device." *Id.* at 96. Mr. Zoldos confirmed that when her two (2) urines were sent out for confirmation at Labcorps both urine screens were reaffirmed as positive for opiates. *Id.* at 97-98; *see also* CYF Exhibit 6 - Urine Screen Report.

Mother had a goal to address her mental health concerns. The CYF caseworker supervisor testified that Mother self-reported to the agency a history of mental health treatment. *Id.* at 33. Mother self-disclosed to CYF diagnoses of depression, anxiety, bipolar disorder, and ADHD. *Id.* When the case opened in September of 2019, the Court directed Mother to address her mental health through Mercy Behavioral Health or some other behavioral health service. *Id.* at 34; *see also* CYF 3 - Certified Dependency Court Orders. Mr. Walters testified that CYF was never

8

able to verify that Mother participated in treatment at Mercy Behavioral Health. *Id.* at 35. Mother reported that she was involved in the NAPT dual diagnosis program in July 2020 and signed a release for CYF; however, Mr. Walters testified that the program had not been responsive to confirm her participation. *Id.* at 34.

Mother had a goal of housing. At the adjudication hearing, Mother had housing; however by January or February 2020, Mr. Walters testified that CYF learned that Mother was facing eviction and provided Mother in-home services, which with Mother did not follow through. *Id.* at 29-30, 51. Mr. Walters further testified that the caseworker assigned to the case attempted to talk to Mother about the pending eviction but that Mother stated that she would not speak to her about it. *Id.* at 51. Sometime after February 2020, Mother was in fact evicted, reported to CYF that she was "couch surfing", and failed to provide an address to where she actually resided. *Id.* at 30. At the time of the contested termination of parental rights proceeding, Mother testified that she was using her mother's address for mail and that she was anticipating moving into the Wood Street Commons shelter within the next day or two "so I can get out of the cold and in somewhere warm." *Id.* at 111, 117. Mother also testified that her children could not reside with her in this shelter placement and had yet to achieve her goal of stable housing. *Id.* at 117.

Mother had a goal to communicate and maintain contact with CYF. The CYF caseworker supervisor, Mr. Walters, testified that from September 2019 to roughly July of 2020, Mother maintained minimal contact with CYF and the service providers. *Id.* at 37-38. Mr. Walters described it as "difficult" to maintain contact with mother and that "contact for much of the life of this case has been minimal." *Id.* Mr. Walters testified that they did receive from Mother, late in 2020, documentation that Mother had completed a virtual parenting program online through Ar-

9

senal, well after the petitions to involuntarily terminate Mother's rights had been filed. *Id.* at 57. The Auberle foster care case manager, Alyssa Johnstone, also testified to her issues in getting Mother to participate, confirm and avail herself of in-person and virtual visitation throughout the pendency of the case. *Id.* at 65-68.

Mother had a goal visitation with her Children and as of the time of the contested termination of parental rights proceedings, Mother's visitation was still court ordered to be supervised. *Id.* at 38; *see also* CYF Exhibit 3 - Certified Dependency Court Orders. The caseworker supervisor, Mr. Walters, stated that Mother's visits were originally scheduled for three times a week but were reduced to twice a week in December 2019 and continued to be scheduled at that frequency through July 2020. *Id.* at 39. Mr. Walters further testified that Mother never improved her attendance at visitation and testified "I don't belief she has attended a visit since November of last year." *Id.* Recognizing that the COVID-19 pandemic impacted visitation, Mr. ,Walters clarified and stated that "[f]or the purposes of schedules or arranging visits it did necessitate at various points that visits be moved to virtual. I don't know that [Mother] has faced any particular barriers related to COVID that might have gotten in the way of her attendance of visits once scheduled. *Id.* at 40.

As it related to Mother's visitation goal, Alyssa Johnstone, who was the Auberle foster care case manager assigned to this case through December 23, 2020, also testified about Mother's contact and visitation with the children. Ms. Johnstone testified that Auberle was responsible for helping to facilitate visitation between the Children and Mother. *Id.* at 61. She stated that initially they were scheduling the supervised visitation around Mother's schedule, which she described as "relatively easy" at the beginning of the case. *Id.* at 62. Ms. Johnstone testified that

10

after "after about two months it was getting difficult being that she would go periods of time without reaching out or confirming the visits." *Id.* at 62. Ms. Johnstone also testified that she had not heard from Mother from between when COVID started until August 2020. *Id.* at 62. She stated that there were a total of forty-four (44) visits scheduled, twenty-one (21) were cancelled by Mother by failing to confirm or by advising she had transportation issues. *Id.* at 64, 67. Additionally, she testified there were fifteen (15) virtual visits scheduled and that thirteen (13) of those visits were canceled. *Id.* at 64-65. Ms. Johnstone explained that Mother seemed to have difficulty doing virtual visits, and at Mother's request, Auberle changed the visitation from the Zoom platform to the Google Duo platform. *Id.* Ultimately, however, for the thirteen virtual visits Mother did not avail herself of, Mrs. Johnstone testified that some were due to Mother failing to confirm her attendance and others were because when they called to talk to Mother, she did not answer on the virtual visit platform. *Id.* at 66. She testified that Mother's excuses for not participating in the virtual visits ranged from technical difficulties to reasons she could not join *Id.* Additionally, the foster parent for the Children also testified regarding their efforts and periods of time when Mother was without contact with the children and foster care agency. *Id.* at 153-171; *see also* KidsVoice Exhibit A - Visitation Logs.

In her testimony, Mother agreed that there had been long periods of time when she has not seen her Children and could not provide a plausible explanation as to why this was, instead blaming the service provider. *Id.* at 112. Mother reported that she was involved in NAPT dual diagnosis program, where she received dosing and outpatient therapy. *Id.* at 104. Mother testified that she gets her mental health medication prescribed by her        PCP, in consultation with the NAPT program and had provided urine screens to her PCP as requested by the program. *Id.*

11

at 104, 106-107. Mother indicated that she had asked for copies of her urine screens from NAPT going back to September 2019 and just recently again asked the program for that information. *Id.* at 130-131. Mother stated that she has a sponsor and attends meetings at the Onala Club. *Id.* 105. Mother had no explanation for the two screens that were confirmed positive for opiates, indicating "it was a blur, honestly." *Id.* at 109. Mother claimed she never received information about the two scheduled evaluations and interactional evaluations with the Court appointed evaluator, claiming that she uses her Mother's mailing address for "important mail" and claimed she hadn't received anything. *Id.* at 111. Mother also indicated that between October 2020 and the day of the proceeding she had been staying at a winter weather shelter, hoping to get into a longer term shelter. *Id.* at 135. Of note, Mother and her counsel did not offer into evidence any witnesses or documentation to substantiate any of her claims.

Mother has regrettably not remedied the conditions that led to her children's most recent removal and adjudication. Most importantly, Mother has not addressed the core issues preventing reunification and this Court finds it unsettling that Mother does not seem to grasp the impact that her lifestyle and continued choices has had on her ability to remedy the conditions that led to the removal. A review of this Court's court orders, entered collectively as CYF Exhibit 3, provides findings of fact at each hearing outlining Mother's continued and repeated inability to remedy the conditions, her overall lack of contact throughout this case, and her overall lack of compliance and progress towards any of her Family Service Plan goals. Sadly, even at the time of the contested involuntary termination of parental rights proceeding, Mother testified that she was living in a cold weather shelter and looking to get into a longer term shelter in order to get out of the cold. Mother's testimony was contradicted by other witnesses and overall lacked credibility.

12

It was unequivocal that CYF met their burden by clear and convincing evidence pursuant to 23 Pa. C.S. § 2511 (a)(1), (2), (5) and (8).

The inquiry then turns to the second issue raised by Mother on appeal – whether CYF has proven that termination is in the Children's best interests pursuant to 2511(b). In relevant part, 23 Pa. C.S. § 2511(b) requires the Court to give "primary consideration to the developmental, physical and emotional needs and welfare of the child" when terminating the rights of a parent.

As discussed by the Superior Court [in] *In re N.A.M.*, the inquiry into whether terminating a parent's rights serves the child's needs and welfare necessarily includes inquiry into the nature and status of any bond between the parent and child and the effect on the child of severing that bond, if it exists:

> However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.,* 946 A.2d 753, 763 (Pa. Super. 2008).
>
> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the Court when determining what is in the best interest of the child. *In re K.K.R.-S.,* 958 A.2d 529, 533–536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.,* 949 A.2d 910 (Pa. Super. 2008) (trial Court's decision to terminate parents' parental rights was affirmed where Court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' Court must examine the status of the bond to determine whether its termination 'would destroy an existing, necessary and beneficial relationship.' *In re Adoption of T.B.B.,* 835 A.2d 387, 397 (Pa. Super. 2003).

33 A.3d 95, 103 (Pa. Super. 2011); *see also In Re: K.Z.S.* 946 A.2d 753 (Pa. Super. 2008) (discussing proper analysis of parent-child bond in terminating parental rights).

*In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993) and its progeny have shaped the traditional subsection (b) analysis and calls for interpretation of any parent-child bond. With respect to this case, this Court heavily relied on the testimony and evaluation of

The CYF caseworker supervisor, Lawrence Walters, testified about his observations of the Children in their foster home. Mr. Walters stated, "[J.D.] is nearly four years old. He is active. At the times I have observed him in the home, he appears to be sort of integrated into the fabric of the family. He interacts with the other children in the home and the caregivers appropriately. Likewise, with [M.D.]. When I have seen her she's been a bit more bold maybe that [J.D.]. A bit more willing to approach myself and others in the home." *Id.* at 42. Mr. Walters also shared that he observed both Children to trust their caregivers, looking to them for care, amusement and other things that children look for caregivers to provide when they are comfortable and acclimated to their environment. *Id.* at 44.

Mr. Walters also testified about the developmental, emotional and physical needs and welfare of the children, explaining that the J.D. receives developmental services related to his difficulty with speaking, as well as occupational and behavioral therapy. *Id.* at 42. Mr. Walters also testified that the M.D. had weak muscle tone and had received speech services related to correcting that. *Id.* Mr. Walters stated that it has been the foster parents who have arranged for and participated in the various developmental services both of these Children required. *Id.* Additionally, Mr. Walters advised that Mother's contact and investment in signing off on services or showing investment in her Children's developmental, physical and emotional needs and welfare was so absent that the Court appointed the foster parents medical and educational decision makers for the children in June 2020. *Id.* at 43.

14

Alyssa Johnstone, the Auberle foster care case manager assigned to this case, also provided testimony about her observation of Mother and her Children during visits. Ms. Johnstone testified that for the in-person visits "[Mother] would try to engage the children, but they would usually just go to the toys rather than engage back. There were a handful of times where they were engaging with her and showing off things they were doing. But it was sometimes a struggle for [Mother] to keep their attention." *Id.* at 67-68. Ms. Johnstone's observations of Mother during the two virtual visits Mother attended with the Children was similar. *Id.* at 68.

As her role as the Auberle foster care case manager, Ms. Johnstone also visited with the Children in their foster home every month. Ms. Johnstone testified that "[The Children] were pretty happy. They were very engage with the other children and both foster parents. I could tell that they were pretty comfortable and just very lively in it....they weren't really afraid of anything. They enjoyed, like I said, playing with the other children, engaging with the foster parents, showing things off to other people whenever they're in the foster home." *Id.* at 69.

Dr. Patricia Pepe, a licensed psychologist with Allegheny Forensic Associates[9] ("AFA"), testified about the Court ordered evaluations she conducted on this case. Dr. Pepe testified that she conducted an interactional evaluation between the Children and their foster parents on October 29, 2020. *Id.* at 77; *see also* CYF Exhibit 7 - AFA Report. Dr. Pepe stated that there was an evaluation of Mother and an interactional evaluation of Mother and the Children scheduled for October 29, 2020 but Mother did not attend. *Id.* Dr. Pepe testified that those evaluations were rescheduled for November 18. 2020, which Mother also failed to attend. *Id.* Moreover, Kim Dalesandro, the Program Director for AFA testified that she is responsible for all of the sched-

---

[9] Allegheny Forensic Associates, also referred to as AFA, is the group of evaluators contracted with the court in Allegheny County to provide court ordered evaluation services.

uling. *Id.* at 172. Ms. Dalesandro testified that she spoke with Mother on the phone on October 21, 2020 and provided her directions and bus routes by text. *Id.* at 172. Ms. Dalesandro stated that after sending Mother the date, time, location and directions for the first scheduled evaluation and interactional, Mother reached out to her and canceled that evaluation. *Id.* at 173. Ms. Dalesandro testified that she reached out to Mother several more times to try and reschedule the evaluation and interactional without success, and ultimately scheduled it as Mother "went radio silence at that point. She stopped reaching out or returning my calls." *Id.* at 173-174.

Dr. Pepe testified about her interactional evaluation between the Children and foster parents:

> The Children are very, very happy. There was consistent positive functioning among family members. I think [foster parents] are exhibiting excellent parenting skills that are serving to enhance the Children's functioning. The Children exhibited multiple behaviors suggesting of a close alignment and attachment...I utilities the parent and child observation form and check list. Some of the behaviors were ongoing eye contact interaction, speaking to one another, spontaneous physical affection. The Children consistently went to their foster parents for assistance. So I thought that there was, you know, a consistent, harmonious tone during the family's functioning, and I assessed [the foster parents] to be a very positive permanent placement for the Children.

*Id.* at 84-85.

Dr. Pepe could not provide any opinion as it related to Mother's mental health status, her capacity to parent, or the attachment of the Children with Mother as she failed to attend the first scheduled evaluation and interactional evaluation, as well as the make-up scheduled evaluation and interactional evaluation.

Thereby, Court was within its discretion when it determined that severing any remaining bond that these Children might have had with their Mother would not cause them extreme emotional consequences. Moreover, the testimony of the CYF caseworker supervisor, the Auberle foster home case manager, and the court appointed evaluator firmly established that termination

16

will be able to provide both Children with much needed stability and permanence at their young age. The testimony and evidence about Mother's significant lack of presence and the result of that absence over an extended period of time did nothing to support or nurture any attachment that might have once existed with the Children. Therefore, this Court correctly concluded that the developmental, physical and emotional needs and welfare of the Children would be best served by terminating Mother's parental rights.

### D. Conclusion

With the grounds for termination firmly established, it was evident to this Court that termination would best meet the needs and welfare of these children. For the reasons set forth in this Opinion, the decision of this Court should be affirmed.

BY THE COURT:

_____, J.